[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 17, 2010
JOHN LEY
CLERK

_____

No. 08-16135

_____

D. C. Docket No. 96-03257-CV-RRA-M

ANTHONY ASH,
et al.,

Plaintiffs,

JOHN HITHON,

Plaintiff-Appellant-
Cross-Appellee,

versus

TYSON FOODS, INC., a corporation,

Defendant-Appellee-
Cross-Appellant,

THOMAS HATLEY, an individual,

Defendant.

_____

Appeals from the United States District Court
for the Northern District of Alabama

_____

(August 17, 2010)

Before CARNES and PRYOR, Circuit Judges, and DOWD,[*] District Judge.

PER CURIAM:

This case is before us for the fourth time. See Ash v. Tyson Foods, Inc., 31 Fed. App'x 938 (11th Cir. Feb. 6, 2002) (Ash I); Ash v. Tyson Foods, Inc., 129 Fed. App'x 529 (11th Cir. Apr. 19, 2005) (Ash II), vacated, 546 U.S. 454, 126 S. Ct. 1195 (2006), reinstated, Ash v. Tyson Foods, Inc., 190 Fed. App'x 924 (11th Cir. Aug. 2, 2006) (Ash III). It used to involve multiple plaintiffs with claims of employment discrimination arising out of the operation of a Tyson Foods chicken processing plant in Gadsden, Alabama. See Ash I, 31 Fed. App'x 938. Now there is only one plaintiff and one claim left: John Hithon and his 42 U.S.C. § 1981 claim based on Tyson's failure to promote him to shift manager at the plant. See Ash III, 190 Fed. App'x 924.

In the second appeal of this case we reversed the district court's Federal Rule of Civil Procedure 50(b) judgment as a matter of law for Tyson on this claim, concluding that the evidence was sufficient to permit a jury to reasonably find that the reason Hithon, who was African-American, was not promoted to shift manager was because of racial discrimination. See Ash II, 129 Fed. App'x at 534, vacated,

---

[*] Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

546 U.S. 454, 126 S. Ct. 1195 (2006), reinstated, Ash III, 190 Fed. App'x at 926–27.  We affirmed, however, the district court's alternative ruling under Federal Rule of Civil Procedure 50(c) that Tyson was entitled to a new trial on that claim because there was insufficient evidence to support any award of punitive damages (the jury had awarded $1,500,000) and because the jury's award of $250,000 in compensatory damages was excessive.  See id.

When the case went back to the district court, it was bifurcated into liability and damages phases.  After Hithon had presented his evidence in the liability phase, Tyson moved for judgment as a matter of law, arguing that Hithon had failed to present enough evidence of discrimination for his claim to go to the jury.  The district court denied that motion.  At the close of all evidence in the liability phase Tyson again moved for a directed verdict and that motion was also denied.  The jury returned a verdict against Tyson on Hithon's discrimination claim, and as damages awarded him compensatory damages totaling $335,000 and punitive damages in the amount of $1,000,000.  The district court denied Tyson's renewed Federal Rule of Civil Procedure 50(b) motion for judgment as a matter of law on the compensatory damages award, holding that there was sufficient evidence for Hithon's discrimination claim to have gone to the jury.  The court granted the Rule 50(b) motion, however, insofar as the punitive damages award was concerned,

holding that there was insufficient "evidence to support a finding that Hatley's actions warranting punitive damages could be imputed to Tyson."  Tyson also filed a Rule 59 motion for remittitur or, alternatively, a new trial, which the court denied.

This case is here because both sides disagreed with the court's rulings. Hithon appealed the court's decision to set aside the punitive damages award. Tyson cross-appealed the court's denial of its renewed motion for judgment as a matter of law and its motion for remittitur or a new trial.  Tyson also appealed certain evidentiary rulings that the court made.

**I.**

In 1982 John Hithon graduated from high school and started working in the Tyson chicken plant in Gadsden, Alabama.[1]  The positions he held at the plant were each a progressive step in his career as a poultry processor.  He started working at the plant as a "live hanger," required to hang 24 chickens a minute. Next he worked in the part of the plant responsible for "killing and picking." After a return to the live hanging department as a front line supervisor, he worked as a supervisor of the "eviscerating" and "debon[ing]" departments.  In 1990

---

[1] At that time, the plant was owned by Spring Valley, but we refer to it as "Tyson" for consistency.

Hithon was promoted to a superintendent position, working the night shift.   He had worked as a superintendent in both of the departments that make up the chicken processing operation (first- and second-processing) before he applied for a shift manager job in 1995.

When Hithon sought a shift manager job, the plant hierarchy was like this from top to bottom: one plant manager, two shift managers, six superintendents, and then a number of supervisors, lead persons and hourly workers.  The Gadsden plant had never had a black plant manager or shift manager, but five of the six superintendents there were black.

In April 1995 Tom Hatley, who is white, was hired as manager of the Gadsden plant.  Soon after he became plant manager, Hatley withheld wage increases for the two shift managers (who were white) because the plant was performing poorly, causing the two of them to resign in June or July of that year, which created two open positions.  At that time Randy King was working as a shift manager at a Tyson plant in Pine Bluff, Arkansas.  Hatley asked him to come to the Gadsden plant to work as shift manager, and he transferred into that position in July 1995.  Steve Dade was working at a small Tyson plant in Boaz, Alabama.  At Hatley's request Dade transferred to the Gadsden plant to work as a maintenance

5

supervisor and three months later, in August 1995, Hatley promoted him to the other shift manager position. Both King and Dade are white.

Hithon, along with some other plaintiffs, later filed a lawsuit alleging employment discrimination. Hithon claimed, among other things, that he was discriminated against on the basis of race in violation of 42 U.S.C. § 1981 when Hatley failed to promote him to either of the shift manager positions. The district court denied Tyson's motion for summary judgment on that particular claim although it did grant Tyson summary judgment on some other claims. In an interlocutory appeal, we affirmed. Ash I, 31 Fed. App'x 938.

Back in the district court, the pre-trial order the parties filed included a section entitled "Contentions of the Parties," which contained this "Agreed Summary" of the facts Hithon alleged regarding his claim:

> Hithon: John Hithon was a superintendent at the Gadsden plant for five years prior to the time both Shift Manager positions became available in July – August of 1995. Hithon met Tom Hatley, plant Manager, and expressed a desire to be considered for Shift Manager, and that he would also need a college degree, which Hithon did not have. Within weeks, the First Shift Manager position was filled by Randy King, a white male, who did not have a college degree, and who was transferred in from another Tyson facility. Hatley told Hithon he was not going to fill the other shift manager position for six months, but within one week, he appointed Steve Dade, a white male, with less experience and ability in being a Shift Manager, than Hithon. As a matter of fact, three other Black males who applied for the position of Shift Manager were more experienced and qualified than Steve Dade. Hithon brought a claim for race discrimination in

6

the promotion decision to Shift Manager and claims back pay, front pay, interest, compensatory and punitive damages, attorney's fees and costs of this action.

The case was tried before a jury. The jury found Hithon had proven his racial discrimination claim against Tyson involving the failure to promote him to shift manager, and it awarded him compensatory and punitive damages.

The district court granted Tyson's Rule 50 motion for judgment as a matter of law on Hithon's promotion discrimination claim. In its order doing so the court summarized Hatley's testimony about his reasons for choosing King and Dade over Hithon as follows: "experience in the poultry industry in a successful plant; leadership and organizational skills; experience in more than one plant; having a college degree; and, as the primary consideration, Hatley's belief that it would be better to have as shift managers persons who were not associated with the badly-performing Gadsden facility." The court concluded that "the evidence of pretext is insufficient to support a finding that the reasons given by Hatley for making King and Dade shift managers were lies intended to cover-up racial discrimination against Hithon." The court also granted Tyson's motion for judgment as a matter of law on the promotion discrimination claim brought by another plaintiff, Anthony Ash.[2] In the alternative, the court granted Tyson's

---

[2] Ash is not a party in this appeal. He is involved in the issues before us only to the extent that he testified in the second trial about how he subjectively interpreted Hatley's use of the term

7

motion for a new trial, finding that the jury's verdict in favor of both plaintiffs was against the great weight of the evidence.

Hithon and Ash appealed. Ash II, 129 Fed. App'x 529, vacated, 546 U.S. 454, 126 S. Ct. 1195 (2006), reinstated, Ash III, 190 Fed. App'x 924. They contended that Tyson's reasons for Hatley's decision not to promote them were pretextual because:

> (1) Hatley provided shifting reasons for his decision not to hire them; (2) Hatley used qualifications that (a) were not required by company policy, and (b) excluded [Hithon and Ash]; (3) Hatley only checked references for black candidates and did not review King's or Dade's performance reviews or personnel files; (4) Hatley lied about a college degree requirement for the shift manager position; (5) Hatley offered King the shift manager position before interviewing Hithon for the job; (6) Hatley hand-picked Dade for the shift manager position despite telling the superintendents that he would hold the position open before deciding on the promotion; (7) Tyson failed to prove that the Gadsen plant was losing money when Ash and Hithon were superintendents; and (8) Hatley's decision was made in an atmosphere where black employees were treated differently, including Hatley's cool demeanor toward the appellants and his statements referring to [Hithon and Ash] as "boys."

Ash II, 129 Fed. App'x at 531.

In Ash II we first considered the evidence about Hatley's use of the word "boy" and held: "While the use of 'boy' when modified by a racial classification like 'black' or 'white' is evidence of discriminatory intent, the use of 'boy' alone

_____

"boy." We will address that testimony later in this opinion.

8

is not evidence of discrimination." Id. at 533 (citation omitted). We also observed that deviation from company policy does not, by itself, establish an intent to discriminate, but it can be circumstantial evidence of discrimination, "especially where the rules were bent or broken to give a non-minority applicant an advantage." Id. We explained that "'in a failure to promote case, a plaintiff cannot prove pretext by simply showing that he was better qualified than the individual who received the position that he wanted.'" Id. (quoting Lee v. GTE Florida, Inc., 226 F.3d 1249, 1253 (11th Cir. 2000) (alterations omitted)). We stated that when qualifications are compared in a discrimination case, pretext can be established "only when 'the disparity in qualifications is so apparent as virtually to jump off the page and slap you in the face.'" Id. (quoting Cooper v. Southern Co., 390 F.3d 695, 732 (11th Cir.2004)). Applying those rules, we held:

> After reviewing the record in the present case, we conclude that Ash did not present sufficient evidence for a reasonable jury to find that Tyson discriminated against him because none of the evidence applicable to his claims establishes discrimination. However, we conclude that Hithon presented a sufficient case of discrimination because he demonstrated that Hatley interviewed him after Hatley had already hired King, indicating that Hatley's stated reasons for rejecting Hithon—his lack of a college degree, his position as a manager at a financially troubled plant, and his lack of experience outside of the Gadsen plant—were pretextual. This evidence of pretext along with Hithon's prima facie case of discrimination was sufficient for the jury to decide whether Tyson discriminated. Accordingly, we conclude that the district court did not err in granting Tyson's [Rule 50(b)] motion for judgment as a matter of law

9

on Ash's claims, but the court erred in granting the motion for judgment as a matter of law on Hithon's claims.

Id. at 533–34. We decided, however, that the district court's alternative decision under Rule 50(c) to grant Tyson's request for a new trial was correct "because there was insufficient evidence to support the jury's punitive damages award and the compensatory damages award was excessive." Id. at 536. On that basis we remanded the case for a new trial. See id.

Our judgment was vacated by the Supreme Court. Ash v. Tyson Foods, Inc., 546 U.S. 454, 126 S. Ct. 1195 (2006) (per curiam). The Court concluded that: "The judgment of the Court of Appeals, and the trial court rulings it affirmed, may be correct in the final analysis. In the course of its opinion, however, the Court of Appeals erred in two respects, requiring that its judgment now be vacated and the case remanded for further consideration." Id. at 456, 126 S. Ct. at 1196.

First, the Supreme Court took issue with this Court's analysis of the racial implications of the word "boy." It instructed us that while the use of the word "boy" does not always evidence racial animus, neither is its use without modifiers always benign. Id., 126 S. Ct. at 1197. The Court stated: "The speaker's meaning may depend on various factors including context, inflection, tone of voice, local custom, and historical usage." Id.

10

Second, the Court rejected the "jump off the page and slap you in the face" standard for inferring pretext based on a comparison of qualifications. Id. at 456–57, 126 S. Ct. at 1197. Finally, the Supreme Court directed this Court to "determine in the first instance whether the two aspects of its decision here determined to have been mistaken were essential to its holding" and remanded for further proceedings consistent with its opinion. Id. at 458, 126 S. Ct. at 1198.

On remand, in regard to Hatley's use of the word "boy," we held:

After reviewing the record, we conclude once again that the use of "boy" by Hatley was not sufficient, either alone or with the other evidence, to provide a basis for a jury reasonably to find that Tyson's stated reasons for not promoting the plaintiffs was racial discrimination. The usages were conversational and as found by the district court were non-racial in context. But even if somehow construed as racial, we conclude that the comments were ambiguous stray remarks not uttered in the context of the decisions at issue and are not sufficient circumstantial evidence of bias to provide a reasonable basis for a finding of racial discrimination in the denial of the promotions. The lack of a modifier in the context of the use of the word "boy" in this case was not essential to the finding that it was not used racially, or in such a context as to evidence racial bias, in the decisions at issue, even if "boy" is considered to have general racial implications. The statements were remote in time to the employment decision, totally unrelated to the promotions at issue, and showed no indication of general racial bias in the decision making process at the plant or by Hatley. Moreover, there is nothing in the record about the remaining factors to support an inference of racial animus in the use of the term "boy."

Ash III, 190 Fed. App'x at 926. We also explained that the "'jump off the page test' was not essential to [our] initial conclusion that the comparative

11

qualifications evidence did not provide sufficient evidence of pretext." Id. at 927. We stated: "On this record, we conclude that the plaintiffs did not meet their burden under Cooper to show that the disparities between their qualifications and the qualifications of King and Dade were 'of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'" Id. (quoting and applying the standard from Cooper v. Southern Co., 390 F.3d 695, 732 (11th Cir. 2004)). After reaching those conclusions, we "reinstate[d] the previous holdings of our [Ash II] decision." Id. at 927. The bottom line for Hithon's case was:

> We reverse the district court's grant of judgment as a matter of law in favor of Tyson on Hithon's discrimination claims but, with respect to Hithon, we affirm the district court's order alternatively granting a new trial because there was insufficient evidence to support the jury's punitive damages award, and the compensatory damages award was excessive. We remand this case to the district court to conduct further proceedings consistent with this opinion.

Id. That left the case in the same procedural posture that it had been in when we issued Ash II, before the Supreme Court vacated our decision and remanded the case to us. See Ash II, 129 Fed. App'x 529. Because a jury might reasonably find that Hatley had not interviewed Hithon until he had already hired King, there was enough evidence of pretext along with the prima facie case of discrimination for the jury to decide whether Tyson discriminated against Hithon in filling that

12

particular position.  Id. at 534.  Hithon had not, however, presented enough evidence to support a compensatory damages award in the amount of $250,000 or any punitive damages award at all.  Id. at 536.  For those reasons a new trial was necessary.  See id.

Back in the district court, a pre-trial order directed the parties to submit their factual contentions before the retrial.  Hithon continued to assert that his discrimination claim was based on Hatley's decision not to promote him to either of the two open shift manager positions, and his factual contentions referred to both the shift manager position awarded to King, which we will call "the King slot," and the shift manager position awarded to Dade, which we will call "the Dade slot."  Tyson responded in its factual contentions that Hithon had not "presented sufficient evidence to allow any promotion claim regarding the promotion of Steve Dade to be presented to the jury, and this claim is not contemplated by [Ash III]."

In pre-trial motions Tyson argued to the district court that evidence about the Dade slot should be excluded, but the court rejected that argument.  Before the retrial Tyson also filed three motions asking the district court to limit the evidence in accordance with the law of the case. [DE:355, 356, 357]  In one of its motions in limine, Tyson contended that the "boy" evidence should be excluded from the

13

retrial. In another motion Tyson argued that this Court had restricted the remand solely to evidence that Hatley had offered King the shift manager job before he interviewed Hithon. In a third motion Tyson asserted that only evidence related to the King promotion "claim" (and no evidence about the Dade promotion "claim") should be admitted. Tyson based that position on our statement in Ash II, which we reinstated in Ash III, that "Hithon presented a sufficient case of discrimination because he demonstrated that Hatley interviewed him after Hatley had already hired King." Ash II, 129 Fed. App'x at 534; see also Ash III, 190 Fed. App'x at 927. Tyson contended that this Court had thereby excluded from the retrial all other "categories of evidence" except evidence about whether Hatley offered a shift manager job to King before he interviewed Hithon. The district court rejected that contention.

In ruling on Tyson's motions in limine, the district court explained that it would not make a pre-trial decision about "each and every bit of evidence" that would be admitted or excluded. It denied Tyson's motion to limit the evidence in accordance with the law of the case, except as to the "boy" comment evidence. The court stated that "[o]rdinarily, a new trial does not limit a plaintiff to presenting the exact same evidence he presented in the original trial." It recognized, however, that the law of the case doctrine "precludes a reexamination

14

of a factual or legal issue previously decided by an appellate court." Based on our Ash II and Ash III decisions, the district court decided that evidence about Hatley's use of the term "boy" should be limited in the second trial: "Assuming that the plaintiffs have presented all of the evidence concerning Hatley's use of the word 'boy,' . . . such evidence has no evidentiary value, and, therefore, the defendant's motion to limit or exclude this evidence is granted."

During the trial, however, the district court reconsidered that issue and asked Hithon's counsel, "[W]hat is going to be different about the evidence [of the use of the term "boy"] in this case?" Hithon's counsel answered that the Supreme Court's opinion had instructed that attention should be paid to "tone, inflection, and context" in the use of the word and that she intended to develop those facts through witness testimony. The district court decided to allow that evidence, explaining that: "[T]his is a new trial. The witnesses are not required to come in and give the exact same testimony. If they were, you might as well just bring them in and let them read the transcript from the previous testimony."

After hearing all of the evidence the jury, in answer to the special interrogatories, found that Hatley did not discriminate against Hithon based on race when he hired King for a shift manager position, but he did discriminate when he put Dade in the other shift manager position. The jury awarded Hithon

$35,000 in back-pay, $300,000 in compensatory (mental anguish) damages, and $1,000,000 in punitive damages. On Tyson's Rule 50(b) motion, the district court vacated the punitive damages award but rejected Tyson's argument that the evidence was insufficient to support a finding of discrimination or the award of compensatory damages. The court entered judgment on the jury's verdict in favor of Hithon in the amount of $364,049.33. Both sides appealed.

## II.

Hithon's direct appeal challenges the district court's decision to vacate the punitive damages award. Tyson's cross-appeal challenges: the district court's refusal to enter judgment in its favor based on the law of the case; the court's denial of its motion for judgment as a matter of law based on insufficient evidence of discrimination; a number of evidentiary rulings the court made; and the court's refusal to order remittitur of the jury's award of compensatory damages. We will take up Tyson's cross-appeal, which is enough to resolve the appeal.

## A.

Tyson first contends that in Ash III this Court remanded the case for the sole purpose of determining whether Hatley racially discriminated against Hithon when he selected King for the first available shift manager job. We need not address

16

Tyson's law of the case argument because in any event the judgment in this case cannot withstand the sufficiency of the evidence challenge.

**B.**

Tyson alternatively contends that even if the law of the case did not prohibit the jury from considering whether Hithon was denied the Dade slot for racially discriminatory reasons, it was still entitled to judgment as a matter of law because the evidence does not support the jury's finding of racial discrimination. "We review the denial of a motion for a judgment as a matter of law de novo, and apply the same standards as the district court." Goldsmith v. Bagby Elevator Co., 513 F.3d 1261, 1275 (11th Cir. 2008). "We will reverse only if the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict." Id. (quotation marks omitted). We view all the evidence and draw all inferences from it in the light most favorable to Hithon because he is the nonmoving party. See id.

Tyson contends that it proffered race-neutral reasons for selecting Dade instead of Hithon and that the evidence at trial was not sufficient to show that its reasons were pretextual. The law of this circuit is that a plaintiff must make an evidentiary showing creating a genuine issue of fact as to pretext for each of the defendant's proffered reasons, not merely for some or most of them. Chapman v.

17

AI Transp., 229 F.3d 1012, 1024–25 (11th Cir. 2000) (en banc) ("If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim."); id. at 1037 (same); Combs v. Plantation Patterns, 106 F.3d 1519, 1543 (11th Cir. 1997) (plaintiff can avoid judgment as a matter of law only by "producing evidence sufficient to discredit in the mind of a reasonable juror all of the defendant's proffered nondiscriminatory reasons for its actions").

With that law in mind, we focus on what Tyson proffered as its primary reason for selecting Dade instead of Hithon: the Gadsden plant had been performing poorly for two years and Hatley, who had been brought in as the new plant manager, wanted to put into the shift manager positions people who had not been in a managerial position at the plant while it had been having problems. Because this is undoubtedly a race-neutral reason, if Hithon failed to introduce evidence from which a reasonable jury could find that it was pretextual, Tyson was entitled to judgment as a matter of law. See Combs, 106 F.3d at 1543 (holding that the defendant was entitled to judgment as a matter of law because the plaintiff "failed to produce evidence sufficient to permit a reasonable juror to reject as spurious [the defendant's] explanation that it promoted [another

18

employee] instead of [the plaintiff] to supervisor because [the other employee] had superior supervisory experience").

We take up in turn each of Hithon's arguments as to why the evidence was sufficient to show that Tyson's stated reason of wanting to promote someone not associated with the management of the plant when it was having problems was pretextual.

**1.**

Hithon does not argue that Dade was associated with the Gadsden plant's problems, and he does not argue that he himself was not part of the plant's management during the time Tyson says it was having problems. Instead, Hithon argues that the plant was not actually performing poorly during that time. The parties dispute whether the plant was actually losing money. Almost all of the witnesses, however, testified that the plant was performing poorly.

For example, Blake, the other African-American supervisor seeking a shift manager position, testified that "the performance of the facility was terrible at the time and . . . I knew we were losing money." Blake testified that because of that poor performance record, he knew that Hatley "would basically be looking to the outside for a fresh set of eyes" for the shift manager positions and that Hatley wanted someone who "wasn't stagnated by what had been happening" at the

19

Gadsden plant. Blake also testified that when he interviewed for the shift manager position, Hatley told him that the overall performance of the Gadsden plant would hurt his chances of being promoted. Hatley testified that they "were under a tremendous pressure to turn the plant around." Even though he had sued the company for not promoting him, Ash agreed in his testimony that in August or September of 1995 a budget plan was in place and the company was trying to save money at every turn. Tyson's Complex Human Resources Manager, Richard Trotter, testified that when Hatley took over as plant manager (as well as before that time), the Gadsden plant was "not doing well." Plant Human Resources Manager Higgins testified that Hatley had told her "that Gadsden was not producing well, that it wasn't as efficient as it should be," and she had been shown some numbers on the Gadsden plant's performance compared to other plants. Dade testified that "[p]roduction-wise we were not doing well at all. I think we were right down towards the bottom of the company." He testified that Hatley had expressed those concerns to him, and added that "our cost to produce a pound of chicken was worse than almost all other plants of Tyson foods."

Dale Carroll, the white shift manager during the period of poor performance who quit after Hatley denied him a raise and whose slot was later filled by Dade, testified that he personally did not believe that at the time Hatley took over as

20

manager the plant was in such bad shape that it needed "turning around." But even Carroll admitted that "[t]he plant in some areas was not performing where it should be." John Pittard, who was in charge of the plant as its manager from 1986 to 1994, testified that on his watch the plant was profitable "for the most part." That testimony, however, was based at least indirectly on Pittard's assessment of his own performance. It had little or nothing to do with Hatley's perception of the plant's performance, which is all that counted. See Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) (in determining whether an employer relied on legitimate nondiscriminatory reasons, we focus on the facts that the employer believed to be true). In light of the mass of testimony to the contrary, the testimony of Carroll and Pittard is not enough for a reasonable jury to have found that Hatley did not believe that the plant was performing poorly when he took over as plant manager.

And coupled with that mass of testimony there is one undisputed fact that underscores how unreasonable it would have been for any factfinder not to find that Tyson was concerned about poor performance at the plant. It is undisputed that the two white plant managers whose departure opened up the King and Dade slots left after they were denied wage increases, and it is undisputed that they were denied wage increases because the plant was performing poorly. It would be

21

illogical to say that the plant was not performing poorly for purposes of filling two manager positions that had become vacant because the plant was performing poorly. Considering this and all of the other evidence presented, no reasonable jury could have found that the plant was not performing poorly at the time that Hithon, who had been in management there for years, was passed over in favor of Dade, who was not associated with the plant and its problems.

**2.**

Hithon also contends that even if the plant was performing poorly at the time the promotion decision was made, the evidence still showed that Tyson's stated reason of preferring someone not involved in the plant's past management was pretextual. Even though Hithon did not appeal the jury's finding that there was no racial discrimination in Hatley's decision to fill the first shift manager slot with King instead of Hithon, he does attempt to use some of the evidence regarding that decision to show pretext concerning the stated reason for promoting Dade to the second slot. Specifically, Hithon argues that the fact that Hatley did not even interview him for the King slot until he had already decided to put King in it shows pretext as to the stated reason for promoting Dade to the other slot. The logical connection escapes us, but even assuming there is one, the evidence at

the retrial did not support the premise that Hatley interviewed Hithon for the King slot only after it was too late.

When this case was here before and we were considering the evidence presented at the first trial, we did conclude that at that trial "Hithon presented a sufficient case of discrimination because he demonstrated that Hatley interviewed him after Hatley had already hired King." Ash II, 129 Fed. App'x at 534, vacated, 546 U.S. 454, 126 S.Ct. 1195 (2006), reinstated, Ash III, 190 Fed. App'x at 926–27. Hithon did not, however, present sufficient evidence to demonstrate that at the retrial. The evidence at the retrial demonstrated just the opposite. Based on all of the retrial evidence, including Hithon's own testimony, no reasonable jury could have found that Hithon was interviewed for the King slot after King already had been hired, which undoubtedly explains the jury's finding at the retrial that Tyson did not discriminate against Hithon in filling that slot.

It is true that Hatley had notes in his day-timer indicating that: he interviewed King on July 21, 1995; King accepted the shift manger position on July 24; and then Hatley interviewed Hithon on July 25. If that evidence were considered in isolation, a jury could reasonably infer from it that Hithon was never actually considered for the King slot because Hatley did not interview him until

23

King already had been hired. There was, however, a lot of other evidence presented about the timing issue.

Hatley explained his day-timer notes in his testimony at the retrial. He told how he interviewed Hithon and Blake before he interviewed King, wrote his notes about those interviews on a pad, and later transcribed them into his day-timer, with the result that the July 25 date does not match the time that Hithon was actually interviewed. Hatley testified that "the internal candidates, John [Hithon] and James [Blake] both, made it known very quickly that they were interested in the job. So their interviews came before anybody else's did." Blake, like Hithon, was an African-American superintendent at the Gadsden plant and also applied for the first shift manager position. He testified that Hatley interviewed him before awarding the job to King. Blake also testified that he never felt that Hatley treated him differently from anyone else because of his race.

In addition to the testimony of Hatley and Blake, Hithon's own testimony established that he had met with Hatley and discussed his interest in being promoted to each of the shift manager positions before each one was filled. Even though Hithon testified at the trial that he never had a "sit-down" meeting, or "an interview at all," with Hatley about either of the two shift manager positions, that

24

testimony was impeached with his earlier deposition testimony, in which he said this about the King slot:

> Q: You did get interviewed?
>
> A. We sat down and we talked.
>
> Q. Where?
>
> A. In Mr. Hatley's office.
>
> *    *    *
>
> Q. That was before Randy King was hired into that job or transferred into that job?
>
> A. Yes, sir.

Hithon also testified that he recalled talking in the hall with Hatley about the second shift manager position to come open. Following that testimony at the retrial, he was again reminded of his earlier deposition testimony. In his deposition he was asked if he had spoken with Hatley about Tyson's policy on the college degree requirement, and he referred to his sit-down meeting with Hatley about the Dade slot as an "interview":

> A. Not until I interviewed with — well, sat down and visited with him about Steve Dade's position.
>
> Q. Okay. And when did you do that?
>
> A. It was in 1995.

25

Q. Was it before Dade got his job or after?

A. Yes, sir, before.

\*      \*      \*

A. It was before [Dade] got the shift manager's job.

In her closing argument, counsel for Hithon urged the jury to consider Hatley's day-timer notes as evidence of "a cover-up." She argued: "Only after the fact, after King accepts the job that he hand-picked, does [Hatley] feel the need to only document the black guys." When the jury considered that argument and weighed all of the "interview" evidence, it found that there was no racial discrimination involved in Hatley's promotion of King instead of Hithon.[3] In making that finding the jury resolved in Tyson's favor the conflicting testimony about whether Hatley "interviewed" Hithon or just had "discussions" with him about both of the shift manager positions, and it decided in Tyson's favor the dispute about how Hatley's day-timer notes should be interpreted. Because there

---

[3] As we have already mentioned, there were separate verdict forms for the King slot and the Dade slot. The jury was specifically asked: "Do you, the jury, find that defendant intentionally discriminated against the plaintiff (i.e., race was a substantial or motivating factor) when the defendant awarded the shift manager's position to Randy King?" The jury's answer was "no." Because its answer to the first question was "no," the jury did not reach the second question on the verdict form, which asked if there was a mixed motive in the King promotion decision: "Do you find that [the] defendant would have made the same promotion decision without the unlawful motive of discrimination?" See Chambless v. La.-Pacific Corp., 481 F.3d 1345, 1348 (11th Cir. 2007) (explaining that the "'mixed-motive' defense . . . concedes that an improper motive played a role in the employer's action while asserting that another, valid reason would have resulted in the same decision").

is no dispute that the process itself and the interview facts were the same for both slots (sit-down discussions with Hatley in his office before the slots were filled), after finding that the process of filling the King slot did not evidence racial discrimination, a reasonable jury could not have found that the same process did evidence racial discrimination as to the Dade slot. The evidence about the interview/discussion process was identical for the King slot and the Dade slot. The very same conduct by a defendant toward the same person cannot be both non-discriminatory and also discriminatory.

The verdict on the King slot therefore establishes that the interviews (or discussions between Hatley and Hithon about the shift manager positions) did not evidence discrimination as to the Dade slot either. See Technical Res. Servs., Inc. v. Dornier Med. Sys., Inc., 134 F.3d 1458, 1464 (11th Cir. 1998) ("[I]t is the duty of the courts to attempt to harmonize the answers, if it is possible under a fair reading of them: 'Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way.'" (quoting Gallick v. Baltimore & Ohio R.R. Co., 372 U.S. 108, 119, 83 S.Ct. 659, 666 (1963))). The jury's verdict in favor of Hithon on the other slot, the one that went to Dade, can stand, if at all, only if there was some other evidence that is sufficient

to support a finding of pretext as to its stated reason for promoting Dade over Hithon. See Combs, 106 F.3d at 1538.

**3.**

Hithon also points to what he says were deviations from company hiring or promotion procedures as evidence of pretext. We have some doubt about whether that argument actually responds to Tyson's stated reason that it picked Dade because he, unlike Hithon, was not part of management during the time the plant was performing poorly. Because Hithon has not pointed to anyone who should have been considered for the Dade slot who had not been associated with the plant's management during that problem period, the procedures used to select Dade may well be irrelevant. Deviation from an employer's ususal hiring or promotion policies may be relevant as circumstantial evidence that it had a preordained, perhaps discriminatory, result in mind. However, that line of reasoning probably works only if the procedural variance operates to exclude from consideration a candidate who meets the employer's substantive criteria. In other words, an employer has no motive to ignore or violate its own procedures to reach a decision if its substantive criteria would compel the same decision if those procedures were followed. Because no black candidate, including Hithon, met the substantive criterion of not having been in the plant's management during the

28

problematic period, any failure of Tyson to follow its usual procedures in filling the Dade slot cannot have been motivated by a desire to discriminate against blacks. It cannot, therefore, be evidence that the substantive criterion is pretextual.

Even assuming, however, that a variance from company procedures could be evidence of pretext when we know that the same result would have been reached anyway given the substantive criterion, Hithon's argument still fails because it has no evidentiary basis. Hithon asserts that Tyson did not post the job vacancies for the shift manager positions even though, he says, the company should have done so under its procedures. Hithon does not, however, contend that the failure to post the vacancies operated to his disadvantage in any way. He testified that he knew about the open shift manager positions and discussed with Hatley his desire to be promoted before either King or Dade had been given the job. Not only that, but Human Resources Manager Higgins testified:

> Back then, in '95, some positions we posted and some we did not. And normally if it was an internal thing, it was—everybody knew that somebody had left and that there was a vacancy. So, you know, you would go to that department head and you would just let them know that you were interested.

Higgins also testified that "normally if [the open position] was internal and we had somebody in there that could do the job that we felt was qualified, we would just

29

normally transfer that person into that position." That is what happened with Dade.

Hithon also asserts that Tyson had a seniority policy and a salary administration plan that required preferential treatment for internal applicants, and that those requirements were disregarded. It is undisputed that Hithon had worked for Tyson for thirteen years, and Dade had worked for the company for about two, so Hithon did have seniority. The variance from that usual internal seniority policy, however, is consistent with Tyson's proffered reason for choosing Dade in the first place—Hatley wanted to put people in the shift manager slots who had not been managing the plant when it was performing poorly. To meet that objective, he had to choose people with less seniority at the Gadsden plant. And there was no evidence that the seniority policy was invariably followed. As for being an internal applicant, it is undisputed that Dade had been working in the Gadsden plant for three months as maintenance supervisor when he was promoted to shift manager, and before that he had worked at Tyson's Boaz plant for two years. So, Dade's promotion was an "internal" one. It was his good fortune to be at the plant when the slot needed to be filled but not to have been there long enough to be considered part of its management during the years the plant had performance problems.

Hithon asserts that Tyson varied from its usual hiring and promotions procedures because Dade did not meet the requirements for the shift manager position that were set forth in a written job summary. It required three to five years experience. Dade only had about two years of poultry processing experience. The shift manager job summary, however, did not specify that the "experience" required for the job had to be in poultry processing. It simply said: "Experience: 3–5 yrs." And Dade had many more years than that of management and leadership experience (as well as a Master's degree in management and human relations), so he met and exceeded the experience requirement set out in the job summary.

Finally, Hithon points to evidence that Dade was not interviewed by the human resources manager before being selected. Higgins, who was the human resources manager, did testify that: "My biggest concern was that I didn't have an opportunity to talk with them. And pretty much the way it was done, [King and Dade] were just brought in. And I was basically—or we were basically told, you know, they had been hired as the shift managers." Higgins' "concern" is not, however, the same thing as a company requirement. While there was evidence that Higgins usually participated in hiring decisions, there was no evidence that she invariably did so or that company policy required that she be given input into all

31

promotion decisions or those at the shift manager level. Higgins did not testify, for example, that she had any input at all in the selection of those who had filled the two slots before King and Dade.

Even if there were some evidence of variation from Tyson's usual hiring or promotion policies or procedures, standing alone that would not evidence racial discrimination. See Mitchell v. USBI Co., 186 F.3d 1352, 1355–56 (11th Cir. 1999) (per curiam) ("Even assuming that USBI did deviate from its policy, this deviation does not raise an inference of discrimination. Standing alone, deviation from a company policy does not demonstrate discriminatory animus."). Here, the closest thing to a variance from Tyson's usual policies or procedures that a factfinder reasonably could find is that the company did not fill the slot with the candidate who had the greatest seniority. As we have already explained, however, there was no evidence that seniority was anything more than a preference, or that it was to trump all other considerations.

Instead, the evidence established beyond any genuine dispute that the overriding consideration used in filling the two open slots was that the person selected be free of the taint of having been part of the plant's management during the period it had performed poorly. The poor performance period is, after all, what led to the slots becoming open in the first place when the two white employees

32

who had filled them during that period were denied raises and left. As Blake testified, Hatley was "looking to the outside for a fresh set of eyes" for the shift manager positions because he wanted someone who "wasn't stagnated by what had been happening" at the Gadsden plant.

**4.**

Hithon also argues that his superior qualifications for the shift manager job show that Tyson's proffered reasons for promoting Dade instead of him are pretextual. In Ash III this Court held that Hithon did not meet the Cooper standard for comparative qualifications. See Ash III, 190 Fed. App'x at 927 ("On this record, we conclude that the plaintiffs did not meet their burden under Cooper to show that the disparities between their qualifications and the qualifications of King and Dade were 'of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'" (quoting Cooper, 390 F.3d at 732, overruled on other grounds by Ash, 546 U.S. at 456–57, 126 S.Ct. at 1197)). Tyson argues that in the second trial Hithon presented no new or different evidence about the disparities between his qualifications and Dade's, so the Ash III holding on comparative qualifications still stands. Because our

examination of the record confirms that, we stick by the conclusion we reached in Ash III, which probably is law of the case anyway.[4]

**5.**

Finally, the testimony about the two occasions when Hatley used the term "boy" was not enough evidence to create a jury issue as to whether Tyson's proffered reason for choosing Dade was a pretext for racial discrimination.[5] In Ash III we applied the factors set forth by the Supreme Court to the evidence on the record before us at that point, and we concluded that "the ['boy'] comments were ambiguous stray remarks not uttered in the context of the decisions at issue and are not sufficient circumstantial evidence of bias to provide a reasonable basis for a finding of racial discrimination in the denial of the promotions." 190 Fed.

---

[4] The evidence about comparative qualifications is such that one of Tyson's proffered reasons for selecting Dade instead of Hithon is that Dade was more qualified for the position. Tyson argues that in light of the evidence about qualifications it is also entitled to judgment as a matter of law on that ground. In light of our decision that Hithon did not create a genuine issue of pretext about Tyson's stated reason of wanting someone who had not been associated in a managerial capacity with the plant when it was performing poorly, we need not decide whether Tyson would be entitled to judgment on its comparative qualifications reason as well. A defendant is entitled to judgment as a matter of law if the plaintiff fails to create a genuine issue of material fact as to any one of the proffered reasons. Chapman, 229 F.3d 1012, 1024–25; Combs, 106 F.3d at 1543.

[5] In its brief to this Court, Tyson also contends that the district court's decision to admit testimony about the use of the word "boy" was an abuse of discretion that warrants a new trial. At oral argument, however, counsel for Tyson agreed that this issue had been waived because counsel made a strategic decision to forego a mistrial on that basis.

Appx. at 926. Under the law of the case doctrine only if "new and substantially different evidence emerge[d] at [the second] trial," <u>Schiavo ex rel. Schindler v. Schiavo</u>, 403 F.3d 1289, 1292 (11th Cir. 2005) (quotation marks omitted), can we revisit that conclusion of law. <u>See</u> <u>id.</u> New and substantially difference evidence about the use of the word "boy" was not presented at the retrial.

Hithon's counsel elicited this testimony from Ash about one instance in July 1995 (before the promotion decisions at issue) when Hatley used the word "boy" when talking to Ash:

> A.  . . . . [I]t was break time, it was lunch time. And we were just sitting in the cafeteria having lunch. And Mr. Hatley walks up to the table without saying anything, but he just said, "Boy, you better get going." So I looked at him. I was shocked that he said it, because, you know, I felt like he said it in a mean and derogatory way.
>
> *     *     *
>
> Q.  And why was that offensive to you?
>
> A.  Because the "boy" word is offensive.
>
> *     *     *
>
> Q.  Can you explain to the ladies and gentlemen of the jury why that comment was offensive to you, Mr. Ash?
>
> A.  Because, you know, being in the South, and everybody know being in the South, a white man says boy to a black man, that's an offensive word.

35

Q.    What do you equate that to, using the word "boy" to a black man?

A.    I equate that to just a racial comment because you might as well use the "N" word if you are going to say that.

Q.    He might as well have walked up and said "nigger" to you; right?

A.    Yeah.

[Counsel for Tyson]: I object to that, Your Honor.  That is so out of line.

The Court: I sustain the objection.

*       *       *

The Court: You're leading the witness.

[Counsel for Tyson]: That's a misleading question.  That's the interjection of a word in this case that has never been in it.

The Court: The question was improper because it was leading the witness, suggesting an answer.[6]

*       *       *

Q.    Who made a comment back [to Hatley]?

A.    My wife.

---

[6] We agree. The question was also highly improper because through it counsel for Hithon interjected the emotionally charged "N" word into the trial, a word that there was no evidence at all that Hatley or anyone else at the plant ever used.  This misconduct by Hithon's counsel may explain why the jury returned a verdict in his favor, even though there was insufficient evidence to support it.  We need not speculate about that, though, because the judgment is due to be reversed for evidentiary insufficiency anyway.

36

Q. What did she say?

A. She said, "He's not a boy. He's a man."

Ash's wife also testified about that incident, stating that Hatley "just looked at [her] with a smirk on his face like it was funny and then he walked off." Hithon testified that sometime after May but before July 1995 he heard Hatley said "hey, boy" as Hithon was leaving a conference room.[7] All of the testimony at retrial about the use of the word "boy" was basically the same evidence that was presented in the first trial. The only additional evidence presented at the retrial was Ash's and Hithon's testimony about how and why the use of the term "boy" is offensive to them, but the issue is not what was in their mind when they heard the term but what was in Hatley's mind when he used it, and there was no new evidence about that. The evidence presented at the second trial was not "new and substantially different," Schiavo, 403 F.3d at 1292, enough for us to revisit the conclusion of law made in our Ash III decision after the Supreme Court's remand. We reiterate that conclusion as part of the law of the case.

## III.

---

[7] Hithon testified: "More than likely we were talking about numbers of some kind. And as I was leaving, [Hatley] said, 'Hey, boy.' And I hesitated, but I continued to walk."

37

Viewing the evidence as a whole in the light most favorable to Hithon, see Goldsmith, 513 F.3d at 1275, a reasonable jury could not have found that racial discrimination was the real reason for Hatley's decision to promote Dade instead of Hithon. The district court erred by refusing to grant Tyson's motion for judgment as a matter of law based on the sufficiency of the evidence to support a finding of intentional discrimination.

Because we conclude that the evidence was insufficient to support the jury's verdict that Tyson intentionally discriminated against Hithon based on his race when Hatley promoted Dade, we need not reach the other issues the parties have raised. The judgment of the district court is REVERSED, and the case is REMANDED for entry of judgment in favor of Tyson.

DOWD, District Judge, dissenting:

I respectfully dissent. Two juries have found the issues in favor of the plaintiff Hithon and granted both compensatory and punitive damages. In my view, the record supports an affirmance of the second jury verdict as to compensatory damages. With respect to punitive damages, the record also supports a conclusion that a punitive damages award is justified, but in my view, the amount of punitive damages awarded by the jury is excessive.

As a consequence, I would affirm the award of compensatory damages and return the case to the district court for a new trial on punitive damages, unless the plaintiff accepts a remittitur.