[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 16, 2011
JOHN LEY
CLERK

_____

No. 08-16135

_____

D. C. Docket No. 96-03257-CV-RRA-M

ANTHONY ASH,
et al.,

Plaintiffs,

JOHN HITHON,

Plaintiff-Appellant-
Cross-Appellee,

versus

TYSON FOODS, INC., a corporation,

Defendant-Appellee-
Cross-Appellant,

THOMAS HATLEY, an individual,

Defendant.

_____

Appeals from the United States District Court
for the Northern District of Alabama

_____

(December 16, 2011)

ON PETITION FOR REHEARING

Before CARNES and PRYOR, Circuit Judges, and DOWD,[*] District Judge.

CARNES, Circuit Judge:

The last opinion we issued in this case, <u>Ash v. Tyson Foods, Inc.</u>, 392 F. App'x 817 (11th Cir. 2010) (<u>Ash IV</u>), was the fourth one in a series from this Court. <u>See</u> <u>Ash v. Tyson Foods, Inc.</u>, 31 F. App'x 938 (11th Cir. 2002) (<u>Ash I</u>); <u>Ash v. Tyson Foods, Inc.</u>, 129 F. App'x 529 (11th Cir. 2005) (<u>Ash II</u>), <u>vacated</u>, 546 U.S. 454, 126 S. Ct. 1195 (2006), <u>reinstated</u>, <u>Ash v. Tyson Foods, Inc.</u>, 190 F. App'x 924 (11th Cir. 2006) (<u>Ash III</u>).

After our <u>Ash IV</u> opinion issued, John Hithon filed a petition for rehearing en banc, which also operates as a petition for panel rehearing. <u>See</u> 11th Cir. R. 35-5. We grant that petition and vacate our earlier <u>Ash IV</u> opinion in this case, except that we incorporate by reference the facts and the long procedural history of this case that were set out in our earlier opinion, <u>see</u> <u>Ash IV</u>, 392 F. App'x at 818–24, although we will also repeat some of it now for the convenience of the reader.

I.

---

[*] Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

This case at one time involved multiple plaintiffs and multiple claims. It is now down to one plaintiff and one claim. This appeal involves that one remaining plaintiff, John Hithon, who is African-American, and his one remaining claim, which is a 42 U.S.C. § 1981 racial discrimination claim based on Tyson Foods' failure to promote him to shift manager at its Gadsden, Alabama chicken processing plant. See Ash IV, 392 F. App'x at 818–19.

A.

Two shift manager slots became open at that plant in the summer of 1995 after the then-new plant manager, Tom Hatley, who is white, denied raises to the white woman and the white man who had held those jobs. According to Hatley, the Gadsden plant was performing poorly and he thought the two managers did not deserve raises. In response they quit, and Hatley later filled their two shift manager positions with white men, first Randy King and then Steve Dade. That happened in July and August of 1995. In December of 1996, this lawsuit was filed. In it Hithon claimed that Tyson discriminated against him based on his race by promoting King and Dade to the two shift manager positions.

Ash I involved Hithon and five other plaintiffs who brought, among other claims, race and sex discrimination and retaliation claims against Tyson. In an 89-page opinion, the district court denied Tyson's motion for summary judgment on:

3

Hithon and Anthony Ash's promotion discrimination claims, two other plaintiffs' retaliation claims, and one other plaintiff's fraudulent inducement of employment claim. The court granted Tyson's motion for summary judgment as to all of the other claims, and it later certified its judgment as final under Federal Rule of Civil Procedure 54(b), permitting the plaintiffs to appeal. They did, and this Court affirmed the district court's order in Ash I.

## B.

After proceedings resumed in the district court on the claims that had survived summary judgment, the court granted Tyson's motion to sever, holding that the promotion discrimination claims of Hithon and Ash would be tried separately from those of the three other remaining plaintiffs.[1] Ash and Hithon's case went to trial, and the jury returned a verdict in their favor, awarding each of them $250,000 in compensatory damages and $1.5 million in punitive damages. The district court held that Hithon and Ash had presented insufficient evidence of pretext, and it granted Tyson's Rule 50(b) motion for judgment as a matter of law on Ash's and Hithon's claims.

In Ash II we affirmed all of the district court's judgment except for the part that disposed of Hithon's 42 U.S.C. § 1981 claim. On that claim we held there

---

[1] Those three other plaintiffs later agreed to the dismissal of their claims with prejudice.

4

was enough evidence for a reasonable jury to find that racial discrimination was the reason that Hithon, who is African-American, was not promoted to shift manager. See Ash II, 129 F. App'x at 534. Our holding focused on and was dependent upon the factual premise that Hithon had not been interviewed until after one of the two open shift manager positions had already been filled by Randy King. We explained in Ash II:

> [W]e conclude that Hithon presented a sufficient case of discrimination because he demonstrated that [plant manager] Hatley interviewed him after Hatley had already hired King, indicating that Hatley's stated reasons for rejecting Hithon—his lack of a college degree, his position as a manager at a financially troubled plant, and his lack of experience outside of the Gads[d]en plant—were pretextual. This evidence of pretext along with Hithon's prima facie case of discrimination was sufficient for the jury to decide whether Tyson discriminated. Accordingly, we conclude that the district court did not err in granting Tyson's motion for judgment as a matter of law on [co-plaintiff] Ash's claims, but the court erred in granting the motion for judgment as a matter of law on Hithon's claims.

Ash II, 129 F. App'x at 534. As we later explained in our Ash IV opinion, however, our judgment in Ash II was vacated by the Supreme Court for two reasons:

> Our judgment [in Ash II] was vacated by the Supreme Court. Ash v. Tyson Foods, Inc., 546 U.S. 454, 126 S. Ct. 1195, 163 L.Ed.2d 1053 (2006) (per curiam). The Court concluded that: "The judgment of the Court of Appeals, and the trial court rulings it affirmed, may be correct in the final analysis. In the course of its opinion, however, the Court of Appeals erred in two respects, requiring that its judgment

5

now be vacated and the case remanded for further consideration." Id. at 456, 126 S. Ct. at 1196.

First, the Supreme Court took issue with this Court's analysis of the racial implications of the word "boy." It instructed us that while the use of the word "boy" does not always evidence racial animus, neither is its use without modifiers always benign. Id., 126 S. Ct. at 1197. The Court stated: "The speaker's meaning may depend on various factors including context, inflection, tone of voice, local custom, and historical usage." Id.

Second, the Court rejected the "jump off the page and slap you in the face" standard for inferring pretext based on a comparison of qualifications. Id. at 456–57, 126 S. Ct. at 1197. Finally, the Supreme Court directed this Court to "determine in the first instance whether the two aspects of its decision here determined to have been mistaken were essential to its holding" and remanded for further proceedings consistent with its opinion. Id. at 458, 126 S. Ct. at 1198.

Ash IV, 392 F. App'x at 822.

### C.

In Ash III, which was issued after the case came back before us on remand from the Supreme Court, we once again addressed the evidence in the record (of the first trial) about Hatley's use of the word "boy," concluding:

After reviewing the record, we conclude once again that the use of "boy" by Hatley was not sufficient, either alone or with the other evidence, to provide a basis for a jury reasonably to find that Tyson's stated reasons for not promoting the plaintiffs was racial discrimination. The usages were conversational and as found by the district court were non-racial in context. But even if somehow construed as racial, we conclude that the comments were ambiguous

6

stray remarks not uttered in the context of the decisions at issue and are not sufficient circumstantial evidence of bias to provide a reasonable basis for a finding of racial discrimination in the denial of the promotions. The lack of a modifier in the context of the use of the word "boy" in this case was not essential to the finding that it was not used racially, or in such a context as to evidence racial bias, in the decisions at issue, even if "boy" is considered to have general racial implications. The statements were remote in time to the employment decision, totally unrelated to the promotions at issue, and showed no indication of general racial bias in the decision making process at the plant or by Hatley. Moreover, there is nothing in the record about the remaining factors to support an inference of racial animus in the use of the term "boy."

Ash III, 190 F. App'x at 926. As for comparative qualifications, this Court held

that the "'jump off the page test' was not essential to [our] initial conclusion that

the comparative qualifications evidence did not provide sufficient evidence of

pretext." Id. at 927. We stated:

On this record, we conclude that the plaintiffs did not meet their burden under Cooper to show that the disparities between their qualifications and the qualifications of King and Dade were "of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question."

Id. (quoting and applying the standard from Cooper v. Southern Co., 390 F.3d

695, 732 (11th Cir. 2004)).

After reaching those conclusions, we "reinstate[d] the previous holdings of

our [Ash II ] decision." Ash III, 190 F. App'x at 927. Those previous holdings in

7

Ash II, which we reinstated in Ash III, included a remand for a new trial on Hithon's § 1981 claim that Tyson's failure to promote him to shift manager was based on racial discrimination. See Ash II, 129 F. App'x at 536. That remand for a new trial in Ash II and Ash III was not on the basis of insufficient evidence to support the jury's finding that the reason Tyson had not promoted Hithon to shift manager was racial discrimination. Instead, we specifically held that there was enough evidence to support that finding, which is why we "reverse[d] the district court's grant of judgment as a matter of law in favor of Tyson on Hithon's discrimination claims." Ash III, 190 F. App'x at 927.

The reason we reversed the judgment as a matter of law in favor of Tyson on Hithon's promotion discrimination claim in Ash II and Ash III was that we concluded Hithon had established a prima facie case of discrimination, and there was some evidence (at the first trial) that could lead a reasonable jury to find that Hatley had not interviewed Hithon until he had already hired King. Ash II, 129 F. App'x at 534. That particular evidence about the timing of the interviews for that slot was enough to support the jury's verdict in favor of Hithon and against Tyson on the § 1981 racial discrimination claim.

If there had not been any further issues requiring a new trial, in Ash III we would have affirmed the judgment in favor of Hithon based on the evidence

8

presented at the first trial. But there were other issues that did require a new trial. The district court had alternatively ruled that Hithon had not presented enough evidence to support a compensatory damages award in the amount of $250,000 or to support any punitive damages award at all. We affirmed those rulings, which meant that the case had to be sent back for a second trial notwithstanding the sufficiency of the evidence to support Hithon's § 1981 claim. Ash III, 190 F. App'x at 927 ("[W]e affirm the district court's order alternatively granting a new trial because there was insufficient evidence to support the jury's punitive damages award, and the compensatory damages award was excessive.").

D.

During the second trial, the one that followed our decision in Ash III, there were a number of changes in the evidence. One thing that changed was the evidence about the timing of the King hire,[2] which went to the issue of pretext. The evidence at the second trial ruled out the factual conclusion that the evidence in the first trial would have allowed the jury to reach about the timing of events that were crucial to filling the shift manager position that went to King.

---

[2] King was already working as a shift manager at a Tyson plant in Arkansas when Hatley chose him to fill one of the shift manager slots at the Gadsden plant. Technically speaking, King made a lateral move and was actually transferred instead of being "hired" or "promoted," but to simplify matters we follow the parties' lead and refer to him in this opinion as having been hired for the shift manager position at the Gadsden plant.

9

The evidence at the second trial, which included Hithon's own testimony on the subject, established that Hithon had met with Hatley (the decision maker) and had discussed his interest in the shift manager position <u>before</u> King was hired, not afterwards as the evidence at the first trial had indicated. That change meant that, unlike the situation at the first trial, which is the evidence we were considering in <u>Ash II</u> and <u>Ash III</u>, at the second trial there was no evidence that Hatley had failed to even talk with Hithon until after the slot that went to King had been filled. So, the racial discrimination claim could not survive at the second trial on the theory that pretext was shown by the failure of Hatley to talk with Hithon about one of the slots until he had already filled it with King. That theory was out.

As we explained in our earlier <u>Ash IV</u> opinion, during the liability phase of the second trial Tyson sought judgment as a matter of law at the close of Hithon's evidence and then moved for a directed verdict at the close of all evidence. <u>Ash IV</u>, 392 F. App'x at 819. The district court denied those motions. <u>Id.</u> In its verdict the jury answered special interrogatories and found that Hatley did not discriminate against Hithon based on race when he hired King for one of the two shift manager positions, but he did discriminate when he promoted Steve Dade to the other open shift manager position. <u>See id.</u> at 824. The jury awarded Hithon

10

compensatory damages in the amount of $335,000 and $1,000,000 in punitive damages. Id. at 819.

After the jury returned its verdict, Tyson renewed its motion for judgment as a matter of law under Rule 50(b), and the district court denied that motion in part and granted it in part. See id. The court ruled that there was enough evidence for Hithon's discrimination claim to have gone to the jury but that there was not enough "evidence to support a finding that Hatley's actions warranting punitive damages could be imputed to Tyson." Id. Tyson had also filed a Rule 59 motion for remittitur of the jury's compensatory damages award or, alternatively, a new trial, which the court denied. See id. The result was that the district court entered judgment for Hithon in the amount of $35,000.00 for back pay, $29,049.33 for back pay interest, and $300,000.00 for mental anguish, for a total award of $364,049.33 in compensatory damages, but the court set aside the jury's award of $1,000,000 in punitive damages. All of that led to this appeal by Hithon and cross-appeal by Tyson.

## II.

Hithon's appeal challenges the district court's judgment vacating the jury's punitive damages award. Tyson's cross-appeal challenges: the district court's refusal to enter judgment in its favor based on the law of the case; the court's

11

denial of its motion for judgment as a matter of law based on insufficient evidence of discrimination; a number of evidentiary rulings the court made; and the court's refusal to order remittitur of the jury's award of compensatory damages. We will begin by addressing each of the issues raised in Tyson's cross-appeal, since Hithon's appeal depends on the judgment in his favor on the discrimination claim surviving Tyson's cross-appeal.

## A.

Tyson first contends that in Ash III this Court remanded the case for the sole purpose of determining whether Hatley, the decision maker for Tyson, racially discriminated against Hithon when he selected King for the first available shift manager job, not whether he did so when he selected Dade for the second shift manager position to become available. Tyson argues that the law of the case, as established in Ash III, precluded the jury from considering whether Hatley discriminated against Hithon in promoting Dade to fill that second slot. "We review de novo the district court's application of the law of the case doctrine." Alphamed, Inc. v. B. Braun Med., Inc., 367 F.3d 1280, 1285 (11th Cir. 2004).

Under the law of the case doctrine, the district court and this Court are bound by findings of fact and conclusions of law made by this Court in an earlier appeal of the same case. Friedman v. Mkt. St. Mortg. Corp., 520 F.3d 1289, 1294

12

(11th Cir. 2008). There are, however, some exceptions to this doctrine, including the presentation of "substantially different" evidence at a retrial. Id. at 1295 (quotation marks omitted). Our predecessor Court recognized that when a district court's judgment has been reversed and the case has been remanded for a new trial the parties are permitted to introduce new evidence: "The parties [are] free on such a reversal to introduce other evidence and to present by amendment new issues, if not inconsistent with what the appellate court had adjudged." Doran v. Petroleum Mgmt. Corp., 576 F.2d 91, 93 (5th Cir. 1978) (quotation marks and alteration omitted).[3]

When we issue "a limited mandate, . . . the trial court is restricted in the range of issues it may consider on remand," United States v. Davis, 329 F.3d 1250, 1252 (11th Cir. 2003), but our Ash III remand was not limited to the failure to promote Hithon to the shift manager slot that King filled. While we might not have reversed and remanded for a new trial but for the evidence at the first trial concerning the King slot, the fact remains that we did not limit the new trial to the issue of whether Hithon had been discriminated against with regard to that one slot. We could have limited it in that way, but we did not. Instead, our remand

_____

[3] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

language stated that we: "reverse the district court's grant of judgment as a matter of law in favor of Tyson on Hithon's discrimination claims." Ash III, 190 F. App'x at 927 (emphasis added). The use of the plural "claims" instead of the singular "claim" indicates that we intended to leave open for the second trial both the discrimination claim about the King slot and the discrimination claim about the Dade slot. There were no other "claims" left in the case. The "claims" language in our statement of reversal and remand established that we were sending the case back for another trial on both the King slot and the Dade slot, leaving open the possibility that different evidence at the second trial might establish that Tyson had discriminated against Hithon based on race in filling the Dade slot. And there was new and substantially different evidence at the second trial, including the testimony of a number of witnesses who had not testified at the first trial.[4]

### B.

Tyson contends that, even putting aside law of the case considerations, it was entitled to judgment as a matter of law at the second trial. It argues that the evidence did not support the jury's finding that Hatley discriminated against

---

[4] At the first trial there was testimony from nine witnesses on the liability issue, while at the second trial there was testimony from twelve witnesses on that issue. And some of the witnesses who testified at both trials gave testimony at the second trial that was more favorable to the plaintiff than their testimony at the first trial had been.

Hithon on the basis of race in filling the second shift manager position because there was insufficient evidence that the proffered race-neutral reasons for selecting Dade instead of Hithon were pretextual.

"We review the denial of a motion for a judgment as a matter of law de novo, and apply the same standards as the district court." Goldsmith v. Bagby Elevator Co., 513 F.3d 1261, 1275 (11th Cir. 2008). "We will reverse only if the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict." Id. (quotation marks omitted). We view all the evidence and draw all inferences from it in the light most favorable to Hithon because he is the nonmoving party. See id.

When pretext is the issue, and judgment as a matter of law to the defendant is under consideration, we "must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (quotation marks omitted). Having considered the parties' arguments on rehearing and carefully revisited the record, for the reasons discussed below we are convinced that enough evidence was presented at the second trial for a reasonable juror to reject as

15

unworthy of credence Tyson's proffered reasons for promoting Dade and to justify the verdict in favor of Hithon on the § 1981 racial discrimination claim. See id. at 1538.

1.

Tyson's proffered race-neutral reason for promoting Dade instead of Hithon was that the Gadsden plant had been performing poorly and Hatley wanted someone who had not been part of management during the plant's period of poor performance. We have held that when the proffered race-neutral reason "is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc). Tyson's proffered reason was race-neutral and could have motivated a reasonable employer's selection decision, if it were true.

Hithon, however, did meet and rebut that proffered reason head on at the second trial. He presented evidence that the Gadsden plant was not performing as poorly as Tyson presented it to be, and that Dade himself had come from a Tyson plant that was performing so poorly it had been closed. Dade worked at the Boaz, Alabama plant before he came to the Gadsden, Alabama plant. Human resources manager (at the complex level) Richard Allan Trotter testified at the second trial

16

that the Boaz plant had closed because of poor performance. Human resources manager (at the plant level) Everneza Higgins testified that the Boaz plant was rumored to have closed because of poor performance. Hatley, by contrast, testified that the Boaz plant had closed because of lack of demand for the kind of meat that plant produced. The testimony conflicted about why the Boaz plant where Dade had served in a managerial position had closed. The jury was entitled to resolve that conflict in the testimony and reasonably could have done so by crediting the testimony of the two human resources managers and finding that the plant from which Dade transferred had done at least as poorly as the Gadsden plant. From that the jury would have had sufficient reason to disbelieve Tyson's proffered reason for selecting Dade instead of Hithon, especially in light of the other evidence that Hithon presented at the second trial.

2.

In addition to meeting head on Hatley's proffered reason for promoting Dade and presenting evidence that it was false, Hithon presented evidence at the second trial that Dade, unlike Hithon, failed to meet the minimum written and unwritten requirements for the shift manager position. The written requirements for the shift manager position were listed on a "job summary" and included "three to five years experience." It was undisputed that Hithon had thirteen years of

17

experience in the poultry industry when he applied for the shift manager job, while Dade had only two. And there was testimony at the second trial indicating that the required "experience" was poultry production experience. Human resources manager Higgins testified that there was "a question" about whether Dade met the minimum written requirements for the shift manager job. Lola Hithon, John Hithon's wife who worked in human resources at the Gadsden plant, testified that Dade did not meet the minimum written requirements. She told the jury that: "One of the minimum requirements for that position is that a person have three to five years experience. And from my knowledge of Steve [Dade], his background in poultry, he did not meet that requirement." Anthony Ash, a former superintendent at the plant and a former plaintiff in this case, testified that Dade did not have the three to five years required experience.

In addition to presenting evidence about the written requirement of three to five years experience for the shift manager position, Hithon presented evidence at the second trial that there was an unwritten requirement that an applicant have experience in both first and second processing to be seriously considered for a shift manager position. Four management level former employees of Tyson, who

had worked at the Gadsden plant, testified that they had been told that experience in both stages of processing was necessary.[5]

Ash was one of the four. He testified at the second trial that having experience in both first and second processing was "a criteria for becoming a shift manager or a superintendent." According to Ash, "[i]f you wanted those jobs, you had to work both processes." He testified that Hatley himself told him that experience in both types of processing was required, which is significant because Hatley was the one who decided who would fill the shift manager positions.

Dale Carroll was another of the four witnesses who gave such testimony. Carroll, who was promoted to shift manager at the Gadsden plant in 1994, was the manager who quit after Hatley denied him a raise and whose slot was later filled by Dade. He testified at the second trial that he had "been told" that "you needed" first and second processing experience to be promoted to shift manager. Before becoming a shift manager Carroll had one year of experience in first processing and four years of experience in second processing.

James Blake, an African-American superintendent who had applied for a shift manager position about the same time Hithon did, was the third person who

---

[5] According to the evidence, "first processing" refers to the initial stages of processing a chicken, which includes killing, while "second processing" involves the later stages.

testified at the second trial about the necessity of experience in both types of processing. He testified that he was "told that if you wanted to move up to a shift manager, you had to have both first and second processing experience." Hithon himself was the fourth witness on this matter. He testified that former plant manager John Pittard told him that he "needed to be a superintendent in first processing and second processing in order to be a shift manager."

In addition to those four witnesses who testified that experience in both types of processing was required, two others testified at the second trial that it was desirable even if not absolutely required. John Pittard was plant manager at the Gadsden plant from 1986 to 1994. He testified that while "there is no hard fast rule" about the steps required before one could become a shift manager, "[m]ost of the time" people who were promoted to shift superintendent or shift manager had worked in either first or second processing, although "[t]hey could possibly come out of one of the . . . support departments." And he also testified that the "best candidate" for shift manager "would have experience on both ends of the plant." Randy King, a white male who was promoted to shift manager in 1995, testified at the second trial that he had first and second processing experience. He acquired that experience in order to "obtain[] knowledge" because he "had aspirations to learn it all and wanted to run it someday."

Viewing the testimony of those six witnesses in the light most favorable to Hithon, a jury reasonably could have found that Tyson had made experience in first and second processing a necessary qualification for the shift manager position, and that everyone recognized that it was highly desirable. And it was undisputed that Hithon had extensive experience in both first and second processing. There was evidence that Dade, by contrast, had either little or no experience in either type of chicken processing. According to Ash, Dade had worked in the personnel department—not in processing— at the Boaz plant before he came to the Gadsden plant. Lola Hithon, who worked in human resources, testified that Dade had human resources experience but that she was "not aware of" his having any experience processing chickens.

There was also evidence presented that Dade had so little experience in chicken processing that Ash and Hithon had to train him when he took over as shift manager. Ash testified that Dade

> told [him] that he didn't know anything about the processing area, that they had promoted him into the job and that he knew that I had plenty of knowledge of the processing and that he would rely on me to train him. And he said he was going to be like a monkey on my back and he wanted to drain me of all the knowledge that I knew in order for him to succeed.

21

Hithon testified that Dade admitted to him that "he didn't have any production experience, but he was willing to learn new things and he was going to drain all of our minds." Human resources manager Higgins testified that Hithon had complained to her that Dade "didn't know the job" and that "he and Mr. Ash were having to train [Dade]."[6]

Hatley testified that Dade had worked as a "superintendent" at the Boaz plant. Former shift manager Dale Carroll testified that Dade had been a "supervisor" at Boaz. Higgins testified that Dade had "some production experience." Higgins did not say how much production experience Dade had, but it could not have been much because he had worked in the poultry industry for only a little over two years when he was promoted to the shift manager position at the Gadsden plant.

In other words, there was a conflict in the evidence about whether Dade completely lacked any processing experience, but no witness testified that he had any significant processing experience. It was undisputed, as we have noted, that Hithon had 13 years processing experience. A reasonable jury could have concluded either that Dade had no processing experience or, at best, that he

---

[6] Higgins did not testify, however, that Hithon ever said to her that he thought the promotion of Dade or the fact that he had to train Dade was racially discriminatory.

certainly did not have as much as Hithon. Thus, a reasonable jury could have found that Hithon met both the written and unwritten requirements for a shift manager position, while Dade met neither of them. See Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 772 (11th Cir. 2005) ("[W]here the qualifications disparity is not the sole basis for arguing pretext, the disparity need not be so dramatic to support an inference of pretext." (emphasis omitted)).

3.

In addition, as we discussed in our now-vacated Ash IV opinion, there was testimony presented at the second trial about two occasions when Hatley used the word "boy" in reference to African-American male employees.[7] On one occasion the comment was directed at Ash, and on another occasion the comment was directed at Hithon. Hithon's counsel elicited the following testimony from Ash

[7] Tyson contends that the district court's decision to admit testimony about Hatley's use of the word "boy" was an abuse of discretion because the law of the case mandated that these were just "stray remarks." In Ash III our statements about the use of the word "boy" were based on the testimony presented at the first trial, see Ash III, 190 F. App'x at 926, and at the second trial Hithon was free to present new or additional evidence about the term, see Doran, 576 F.2d at 93. The district court did not abuse its discretion in admitting that testimony in light of the Supreme Court's instruction that the term may be evidence of racial animus, depending on "various factors including context, inflection, tone of voice, local custom, and historical usage." Ash, 546 U.S. at 456, 126 S. Ct. at 1197. In Ash III we discussed the context of Hatley's use of the term but concluded "there is nothing in the record about the remaining factors to support an inference of racial animus in the use of the term 'boy.'" Ash III, 190 F. App'x at 926. At the second trial Hithon introduced additional evidence that developed the record regarding those remaining factors.

23

about the time in July 1995 (before the promotion decisions at issue) when Hatley used the word "boy" when talking to Ash:

> [I]t was break time, it was lunch time. And we were just sitting in the cafeteria having lunch. And Mr. Hatley walks up to the table without saying anything, but he just said, "Boy, you better get going."
>
> So I looked at him. I was shocked that he said it, because, you know, I felt like he said it in a mean and derogatory way.

Ash testified that Hatley's use of the word was offensive to him:

> A. Because, you know, being in the South, and everybody know[s] being in the South, a white man says boy to a black man, that's an offensive word.
>
> Q. What do you equate that to, using the word "boy" to a black man?
>
> A. I equate that to just a racial comment because you might as well use the "N" word if you are going to say that.[8]

---

[8] After Ash gave that answer, plaintiff's counsel said: "He might as well have walked up and said 'nigger' to you; right?" Tyson argued in its brief to this Court that plaintiff's counsel engaged in misconduct and attempted to stir the passions of the jury by interjecting that word into the litigation —a word that no one had ever accused Hatley or anyone else at the plant of using. We agree with Tyson that plaintiff's counsel's interjection of that word, which the witness himself apparently was unwilling to utter, was an improper attempt to inflame the jury. If Tyson's attorney had requested a mistrial and been denied one, we would face the question of whether to reverse the judgment on this ground. However, Tyson's attorney did not request a mistrial on this ground and conceded to us at oral argument that he had made a strategic decision not to seek one. An attorney who gambles and loses at trial cannot expect to play a different hand in the court of appeals.

24

Ash described Hatley's tone as "mean and demeaning, degrading." He testified that in response to the comment his wife had told Hatley: "'He's not a boy. He's a man.'"

Ash's wife also testified about that same incident involving her husband. She described how she was having lunch in the cafeteria with her husband and her sister when Hatley used "boy" to refer to Ash. She testified that when he did it Hatley "just looked at [her] with a smirk on his face like it was funny and then he walked off."

Hithon himself was not present when Hatley referred to Ash as "boy," but on a different occasion Hatley referred to Hithon himself as "boy" in speaking to him. Sometime after May but before July 1995, as he was leaving a conference room, Hithon heard Hatley say "hey, boy." Hithon testified: "More than likely we were talking about numbers of some kind. And as I was leaving, [Hatley] said, 'Hey, boy.' And I hesitated, but I continued to walk." Hithon described Hatley's tone of voice as "extremely condescending." He explained that the term "was offensive" to him and that it was racially derogatory.[9]

---

[9] An amicus brief that was submitted in support of Hithon's petition for rehearing recounted the facts incorrectly when discussing the evidence at the second trial about the one occasion when Hatley used the word "boy" in reference to Ash and the other occasion when Hatley used the word in reference to Hithon. Amici assert: "At the second trial, following Ash III, counsel elicited testimony that Hithon and Ash were having lunch in the cafeteria in July 1995 (before the promotion decision at issue) when Hatley "walk[ed] up to the table without

In our now-vacated Ash IV opinion, we concluded that the evidence about the use of the word "boy" that was presented at the second trial "was not 'new and substantially different' enough for us to revisit the conclusion of law made in our Ash III decision after the Supreme Court's remand." Ash IV, 392 F. App'x at 833 (citation omitted), but we now reach a different conclusion. Some new and substantially different evidence about Hatley's use of the word "boy" was presented at the second trial, see supra p.15 n.4, and that evidence cannot be considered in isolation. We instead must consider it in combination with all of the other evidence.

At the first trial there was virtually no evidence about the factors relating to the use of the word "boy" that the Supreme Court set forth in the Ash III remand: "context, inflection, tone of voice, local custom, and historical usage." Ash, 546 U.S. at 456, 126 S. Ct. at 1197. At the second trial, Ash, Ash's wife, and Hithon testified about their perception of Hatley's tone of voice or facial expression when he used the term. Ash testified about his understanding of the word's implications

_____

saying anything, [and then] said 'Boy, you better get going.'" In reality, there was no testimony or other evidence that Hithon was present when that statement was made to Ash. Instead, Ash and his wife both testified that only they and Mrs. Ash's sister were present. Despite Hithon's absence during that incident, amici assert that "Hithon also testified that Hatley addressed him as 'boy' *a second time*." (emphasis added). That is simply not true. The record shows that Hithon testified about only a single occasion when Hatley referred to him as "boy." Although we welcome amicus curiae briefs that are helpful, misstatements of facts are not helpful.

26

in terms of local custom and historical usage, and Hithon elaborated on that subject as compared to his testimony in the first trial. And the evidence about the timing of the comment to Ash was also different at the second trial. At the first trial Ash and his wife testified that the comment in the cafeteria was made sometime after the promotion decisions at issue in this case, but at the second trial they testified that the comment was made just before the promotion decisions.

The jury's verdict on Hithon's two claims suggests that, even with the new evidence, Hatley's use of the word "boy" alone did not establish discrimination. The same evidence about Hatley's use of that word applied to both the King slot and the Dade slot. Yet the jury decided against Hithon on the King slot, and Hithon has not challenged that part of the verdict on appeal. It follows that Hatley's use of the word "boy" was not enough by itself to convince the jury of racial discrimination. But we do not view that evidence by itself in relation to Hithon's claim about the Dade slot, which the jury did resolve in Hithon's favor.

4.

Instead, we consider all of the evidence cumulatively, viewing it in the light most favorable to Hithon, to determine whether it is enough for a reasonable jury to have found that Tyson discriminated against Hithon based on race by promoting Dade to the shift manager position. As we have discussed, there was enough

27

evidence for a reasonable jury to have found pretextual Tyson's proffered race-neutral reason of wanting a shift manager who had not been in management at the failing plant; to have found that there was a written job requirement of three to five years experience in the poultry business, which Hithon met but Dade did not; to have found that there was also an unwritten job requirement of experience in first and second processing, which Hithon met but Dade did not; and to have found that Hatley, the decision maker, used the word "boy" in a racially demeaning way to refer to Hithon and another African-American male employee on two occasions just before the decision was made.

In light of all of the evidence, we cannot say that "the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict." Goldsmith, 513 F.3d at 1275 (quotation marks omitted). The verdict could have gone either way, and it went Hithon's way. We cannot say that the evidence he presented at the second trial was not sufficient to demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Combs, 106 F.3d at 1538 (quotation marks omitted). Accordingly, we reject Tyson's challenge to the sufficiency of the evidence to support a verdict that Tyson discriminated against

28

Hithon on the basis of race when it failed to promote him to the shift manager position that went to Dade.

## III.

Tyson also challenges a number of the district court's rulings admitting evidence during the damages phase of the bifurcated second trial. The evidence in question related to claims on which Tyson had prevailed at the summary judgment stage. That evidence involved: Hithon's demotion from his superintendent position; Dade's negative evaluation of him; the denial of a pay raise to Hithon in 1996; the taking away of his office and restricting his long distance calls; Tyson's temporary promotion of Hithon's wife to a shift manager position after Dade left; and what Hithon alleged was his constructive discharge. Tyson argues that the district court confused the jury by instructing it as follows about the limitations on considering some of that evidence: "This questioning is not to get into the question of whether he was wrongfully denied [the shift manager] position after Dade left. Nothing to do with that. It's just how applying for that position and perhaps his wife getting it temporarily instead of him would affect his mind." That instruction is not a model of clarity, but Tyson did not object to it when it was given.

As for the evidence Tyson complains about, the district court did not abuse its discretion by admitting that evidence. It was arguably relevant to the issue of whether Hithon suffered mental anguish, and if so how much, after Tyson racially discriminated against him by promoting Dade instead of Hithon to the shift manager position. Hithon was not using that evidence to establish liability, and the district court gave a limiting instruction to which Tyson did not object. It charged the jury:

> Let's be clear about one thing. Sometimes evidence is admissible for one purpose and improper for another purpose. You found one event of discrimination. I instruct you that there is no other wrongful employment act of the defendant in this case, and you must not think so.

> For example, after the act of discrimination you found in this case, the evidence showed that Mrs. Hithon was temporarily named shift manager, the very job that the plaintiff wanted. The fact that the plaintiff did not get the job at that time has nothing to do with this case except to the extent you find it relevant to the plaintiff's mental anguish claim.

We presume that the jury followed that instruction. See United States v. Lopez, 649 F.3d 1222, 1237 (11th Cir. 2011) ("We presume that juries follow the instructions given to them.").

30

IV.

The compensatory damages part of the judgment against Tyson totaled

$364,049.33, of which $300,000 was for mental anguish Hithon suffered. The

district court denied Tyson's post-trial motion for remittitur of the $300,000

amount or, in the alternative, a new trial. Tyson challenges the district court's

denial of that motion.

Our review of a district court's decision not to remit compensatory damages

is "highly deferential." Griffin v. City of Opa-Locka, 261 F.3d 1295, 1315 (11th

Cir. 2001). And "[w]e are particularly deferential to the fact finder's

determination of compensatory damage awards for intangible, emotional harms

because the harm is so subjective and evaluating it depends considerably on the

demeanor of the witnesses." Id. (quotation marks omitted). We have held that

"[w]hen an award of damages has been reviewed and upheld by the trial judge, it

is entitled to a presumption of validity." Ferrill v. Parker Grp., Inc., 168 F.3d 468,

476 (11th Cir. 1999); see also Sykes v. McDowell, 786 F.2d 1098, 1105 (11th Cir.

1986) ("A jury verdict may be vacated as excessive only if it is so large as to

shock the conscience." (quotation marks omitted)).

Tyson contends that the amount of the jury's award for mental anguish

indicates bias, passion, and prejudice. It argues that Akouri v. Fla. DOT, 408 F.3d

31

1338 (11th Cir. 2005), is the "most comparable case." The <u>Akouri</u> case, however, is not comparable because Akouri did not present any evidence of mental anguish while Hithon did. <u>See</u> <u>id.</u> at 1345–46.

Akouri, a native of Lebanon, had unsuccessfully applied for three promotions over the course of six years. <u>Id.</u> at 1341. A supervisor told Akouri that he was not promoted to one of those positions because "it supervised white employees, as opposed to black or Hispanic employees, and that they would not take orders from him, particularly if he had an accent." <u>Id.</u> Akouri brought discrimination claims against his employer under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e <u>et</u> <u>seq.</u> <u>Id.</u> The jury awarded him $552,000 in mental anguish damages. <u>Id.</u> at 1342. Finding that Akouri had failed to prove that he had suffered mental anguish, the district court entered judgment notwithstanding the verdict, reducing the jury's award to nominal damages. <u>Id.</u> It did so because Akouri had presented no evidence at all to support any mental anguish damages. <u>Id.</u>

We affirmed the district court's judgment, explaining that any inferences made by the jury based on Akouri's demeanor while testifying at trial were not enough to support the award of damages for mental anguish. <u>Id.</u> at 1344. There was nothing in the record to support that award, because Akouri "made no attempt

32

to describe any kind of harm, mental, emotional, or otherwise, arising from the discrimination." Id. at 1345. We reasoned that "if Akouri [had] suffered emotional pain or distress, it could have been presented by one or more direct questions during his testimony." Id. at 1346 n.6.

By contrast, when Hithon testified during the damages phase of the trial, his counsel did question him about his emotional pain and distress. Hithon answered that the denial of the promotion had caused him to become physically ill: he could not eat or sleep; he was nauseated; he had chest pains, digestive problems, and numbness in his arm. He lost about 40 pounds between July and November 1995. He testified that it was "extremely degrading" to train Dade for the job that he had wanted for himself. He lost his self-esteem. Co-workers asked Hithon why he did not get the job and they made jokes about what had happened. Dade gave him a negative performance evaluation, which was the first one Hithon had ever gotten in his 13 years at Tyson. Then in March 1996, when Dade left Tyson, Hithon's wife was promoted to acting shift manager, making her his supervisor, even though Hithon had more experience than she did, and she had not even applied for the shift manager job.

In support of Hithon on the mental anguish issue, his wife recounted how, until he was denied the promotion in 1995, the couple had no marital problems,

33

but after that, Hithon's "whole attitude" changed and he would come home and close himself in the bedroom, not speaking to his wife or children. His relationship with his wife and children deteriorated, and friends noticed his strange behavior. She testified that Hithon often vomited before work, and he lost a lot of weight.

Human resources manager Higgins testified that Hithon came to her and told her about Dade's promotion and complained that it was "not fair."[10] He was "pretty upset." She testified that before then Hithon had always been "down-to-earth" and "very calm" and "very rational," and she had "never really seen him emotional." In 20 years of knowing him, she had never seen him as upset as he was after he was denied the promotion. Based on all of that evidence, and applying our highly deferential standard of review, we conclude that the district court did not abuse its discretion in denying Tyson's motion for remittitur of the mental anguish component of the compensatory damages award.

V.

We turn now to Hithon's appeal, in which he contends that the district court erred by vacating the jury's award against Tyson of $1,000,000 in punitive

---

[10] Higgins did not testify, however, that Hithon had ever complained to her that the unfairness of the promotion decision involved any racial discrimination.

damages.  We review de novo a district court's decision to grant a motion for judgment as a matter of law that vacates a punitive damages award.  Toole v. Baxter Healthcare Corp., 235 F.3d 1307, 1317 (11th Cir. 2000).

A plaintiff seeking punitive damages against an employer for job discrimination faces daunting obstacles under the law established by decisions of the Supreme Court and this Court.  "Punitive damages are disfavored by the law and are awarded solely to punish defendants and deter future wrongdoing."  Ferrill, 168 F.3d at 476 (quotation marks omitted).  "The Supreme Court has directed that, for the issue of punitive damages to reach the jury in a section 1981 case, the plaintiff must come forward with *substantial evidence* that *the employer* acted with actual malice or reckless indifference to his federally protected rights."  Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1280 (11th Cir. 2002) (citing Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 536–37, 119 S. Ct. 2118, 2125–26 (1999)) (emphasis added).  "Malice means an intent to harm and recklessness means serious disregard for the consequences of one's actions."  E.E.O.C. v. W&O, Inc., 213 F.3d 600, 611 (11th Cir. 2000) (alteration and quotation marks omitted).

"[P]unitive damages will ordinarily not be assessed against employers with only constructive knowledge of harassment."  Miller, 277 F.3d at 1280 (quotation

35

marks omitted). Instead, punitive damages are available only if "the discriminating employee was high up the corporate hierarchy or . . . higher management countenanced or approved his behavior." Id. (alteration and quotation marks omitted).

Moreover, "in the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good-faith efforts to comply with [§ 1981]." Kolstad, 527 U.S. at 545, 119 S. Ct. at 2129 (quotation marks omitted);[11] see also Miller, 277 F.3d at 1280 ("[T]he Supreme Court has held that employers may assert a good faith defense to vicarious liability for punitive damages where the employment decisions of managerial agents . . . are

_____

[11] Kolstad involved a Title VII claim, but we have held that an award of punitive damages on a § 1981 claim, just like one under Title VII, 42 U.S.C. § 1981a, must be supported by proof that the employer's conduct was malicious or recklessly indifferent. See Ferrill, 168 F.3d at 476 ("Under § 1981, punitive damages may be awarded when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." (quotation marks omitted)); see also Miller, 277 F.3d at 1280 (holding that a plaintiff with a § 1981 claim must present "substantial evidence that the employer acted with actual malice or reckless indifference to his federally protected rights"); Bryant v. Jones, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009) (noting that "discrimination claims . . . brought under the Equal Protection Clause, 42 U.S.C. § 1981, or Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, are subject to the same standards of proof and employ the same analytical framework").

contrary to the employer's good-faith efforts to comply with [§ 1981]." (quotation marks omitted)).

Applying the law established in all of those decisions, the district court determined after the damages verdict was returned that the evidence did not present a jury question on the punitive damages issue. In doing so, the court correctly distinguished the question of whether there was sufficient evidence that in deciding to promote Dade instead of Hithon, Hatley discriminated on the basis of race from the question of whether there was sufficient evidence to support an award of punitive damages against Tyson—not against Hatley the decision maker, but against Tyson the employer. See, e.g., Kolstad, 527 U.S. at 534–46, 119 S. Ct. at 2124–29 (distinguishing between the facts that will support an award of compensatory damages and the additional facts required for an award of punitive damages); Miller, 277 F.3d at 1275–81 (analyzing the two issues separately and reversing the award of punitive damages while affirming the award of compensatory damages); Dudley, 166 F.3d at 1323 (same).

The district court gave three reasons why the jury's award of punitive damages against Tyson could not stand: 1) Hithon had "not attempted to refute the argument that Hatley was not far enough up in the corporate hierarchy to impute his actions to his employer"; 2) "[i]t is undisputed that Tyson's higher

37

management was never informed of Hatley's discriminatory acts or that they approved of his behavior in any way"; and 3) "[i]t is undisputed that Tyson had implemented several policies to prevent discrimination in promotion and hiring decisions."

## A.

The first two reasons the district court gave for setting aside the punitive damages award relate to the requirement that they cannot be awarded against a corporate employer without proof that either the employer itself knew about or ratified the discriminatory acts, or the decision maker who discriminated was far enough up in the corporate hierarchy that his discriminatory acts should be imputed to the corporate employer. See Miller, 277 F.3d at 1280; Dudley, 166 F.3d at 1323.[12] There was no dispute in the evidence about the facts relating to this requirement for punitive damages, because there was no evidence to support a finding that Hithon had carried his burden of establishing it.

---

[12] Dudley also held that there could be no punitive damages unless the discriminatory acts were "egregious." 166 F.3d at 1322–23. The Supreme Court in Kolstad rejected the requirement of egregiousness, 527 U.S. at 535, 119 S. Ct. at 2124, but did not abrogate Dudley's requirement that there could be no punitive damages based on constructive knowledge unless the decision maker were high in the corporate hierarchy. Our later decision in Miller recognizes that Kolstad did not affect that part of Dudley; Miller reiterates and applies Dudley's high-in-the-hierarchy rule. See Miller, 277 F.3d at 1280; see also Kolstad, 527 U.S. at 541, 119 S. Ct. at 2127 (citing that part of our decision in Dudley, 166 F.3d at 1322–23, with favor for the proposition that "agency principles limit vicarious liability for punitive damages awards").

Hithon presented no evidence at all that the higher corporate officials of Tyson countenanced or approved Hatley's discrimination based on race or even knew that he was alleged to have done it until Hithon filed his lawsuit a year after he was denied the promotion. Not only that, but there was not any evidence that Hithon had asserted to any officials at the local plant, or elsewhere, that he thought that he had been denied the promotion because of his race. He did say that he thought the promotion decision was "not fair," but there was no evidence he ever said it was because of his race. There is no evidence he complained about racial discrimination to Higgins, the local plant's human resources manager, or to anyone else, including his own wife. At the time Hithon was denied the promotion, Lola Hithon was a shift human resources manager at the Gadsden plant. Her duties included investigating complaints. She testified as a witness for her husband at the trial, yet neither she nor he testified that at the time he was denied the promotion, or at anytime before the lawsuit was filed, Hithon had told her that he thought the reason he was denied the promotion was racial discrimination. So far as the record shows, he did not assert that to anyone, much less to anyone at the corporate headquarters in Arkansas.

Counsel for Hithon does not dispute this. Instead, she takes the position now, as she did during the damages phase of the trial, that it did not matter

39

because Hatley was manager at the local plant. She argued to the jury: "Now, the defendant may come in here and argue and say, well, you've got to show corporate headquarters knew about this. Our position is, Hatley was as high as you can get at Gadsden, high as you can get for this man." The problem with her position is that it is flatly contrary to the law of this circuit.

Hithon's own evidence establishes without dispute that Tyson is a huge, multi-national company. Its annual report, which was admitted as a plaintiff's exhibit at trial, shows that Tyson is an $11 billion corporation with 107,000 employees and more than 300 facilities and offices in 28 states and 20 countries.[13]

Instead of acknowledging how difficult those facts made it for Hithon to establish that Hatley was high in the Tyson corporate hierarchy, Hithon's counsel instead sought to sidestep that requirement. She urged the local jurors to send the big corporation a big message. After reminding the jury what a big corporation Tyson was, she implored: "I want you as a jury in Gadsden, Alabama, to tell them,

---

[13] In her argument to the jury during the damages phase, Hithon's counsel stated that the jury could "look in the book" and see that "they are in 80 countries—plants all over the world." To the extent counsel meant that Tyson had plants in 80 countries, "the book" does not say that. Instead, Tyson's annual report, which she put into evidence, showed that while Tyson was "providing products and services to customers throughout the United States and more than 80 countries," its approximately 107,000 employees were "employed at more than 300 facilities and offices in the United States and around the world." We do not mean to suggest that her mistaken statement was material. Under either scenario—plants in 80 countries or sales in 80 countries with more than 300 facilities and offices around the world—the result is the same.

'You are not going to make decisions like this anymore.'" Of course, it was undisputed that Tyson—the big, multi-national corporation with more than 100,000 employees and with plants all over the world—had not made the decision about who would be promoted to shift manager at the Gadsden plant; a local plant manager had made it.

The law does not allow a jury to impose punitive damages on an employer based on the decision of one who is not high enough in the corporate hierarchy simply because the jury wants to send a big corporation a big message. See Kolstad, 527 U.S. at 529–30, 119 S.Ct at 2122 ("Punitive damages are limited . . . to cases in which *the employer* has engaged in intentional discrimination and has done so with malice or with reckless indifference to the federally protected rights of an aggrieved individual." (quotation marks omitted) (emphasis added)). Nor does the law allow a jury to impose punitive damages simply on the basis that the decision maker was in charge of one of the hundreds of plants and offices that the employer had worldwide.

Hithon's counsel also argued to the jury that punitive damages were warranted against Tyson because the Gadsden plant, which Hatley managed, had 1,400 employees. However, her own exhibit (Tyson's annual report) showed that Tyson had a total of 107,000 employees, which means that less than 1.5 percent of

41

Tyson's employees worked at the Gadsden plant. That exhibit also showed Tyson had hundreds of facilities and offices around the world, and Hatley was just one manager of one of its plants.

Our decision in Dudley is instructive. We found in that case that evidence supported the jury's verdict that a Wal-Mart store manager or co-manager, or both, had "misused the authority delegated to them by Wal-Mart: they discriminated against plaintiff on account of her race, demoting her." Dudley, 166 F.3d at 1323. Nonetheless, we reversed the jury's award of $250,000 in punitive damages. Id. at 1322–23. We did so because: "Neither [the manager or co-manager of the store] is high enough up Wal-Mart's corporate hierarchy—*if* they can be said to be in the corporate management hierarchy at all—to allow their discriminatory acts to be the basis for punitive damages against the corporation." Id. at 1323. The same is true in this case. Like the store manager and co-manager of Wal-Mart in Dudley, as a local plant manager for Tyson, a multi-national corporation with hundreds of facilities and offices worldwide, Hatley—if he can be said to be in the corporate hierarchy at all—is not high enough up in it to allow his discriminatory acts to be a basis for punitive damages against the corporation.

In explaining its decision to set aside the punitive damages award in this case, the district court listed six levels of Tyson officials, outside the local plant,

42

who were above all of the plant managers, like Hatley, in the corporate hierarchy: "the Complex Manager, the Regional Manager, the Division Vice President, the Senior Vice President of Operations, and the Executive Vice President of Operations," and "[p]resumably there is also a president who is over the Executive Vice President of Operations." The district court also found that it was "undisputed that Tyson's higher management was never informed of Hatley's discriminatory acts or that they approved of his behavior in any way," and even if Hatley did act with malice or reckless indifference, his actions could not be imputed to Tyson. We agree. Hithon failed to offer any evidence that "higher management countenanced or approved [Hatley's] behavior," Miller, 277 F.3d at 1280 (quotation marks omitted), or even knew anything about the racial discrimination before the lawsuit was filed. And the undisputed evidence shows that Hatley, a manager at one of hundreds of Tyson's facilities and offices worldwide, was not high enough up in the corporate hierarchy at Tyson, if he was in the hierarchy at all, to meet the Dudley requirement for imputing his discriminatory conduct to Tyson.

B.

The district court also based its decision to set aside the award of punitive damages on the fact that Hatley's conduct in making the promotion decision based

43

on race was contrary to Tyson's good faith efforts to comply with job discrimination laws.  The legal premise for that reasoning is well established.  See Kolstad, 527 U.S. at 545, 119 S. Ct. at 2129; see also Miller, 277 F.3d at 1280. The Kolstad decision could not have been any clearer about it.  In that decision the Supreme Court forthrightly held:

> In light of the perverse incentives that the Restatement's "scope of employment" rules create, we are compelled to modify these principles to avoid undermining the objectives underlying Title VII.  Recognizing Title VII as an effort to promote prevention as well as remediation, and observing the very principles underlying the Restatements' strict limits on vicarious liability for punitive damages, *we agree that, in the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good-faith efforts to comply with Title VII. . . .* [G]iving punitive damages protection to employers who make good-faith efforts to prevent discrimination in the workplace accomplishes Title VII's objective of motivating employers to detect and deter Title VII violations.

Kolstad, 527 U.S. at 545–46, 119 S. Ct. at 2129 (alterations, citations, and quotation marks omitted) (emphasis added).  As we have already noted, the analytical framework and rules about employer liability under Title VII and § 1981 are the same.  See supra p.37 n.11.

The factual basis for the district court's conclusion that Tyson had established the Kolstad good faith defense in this case is unassailable—it is based on uncontradicted evidence.  The evidence is undisputed that Tyson made

"good-faith efforts to comply with" the anti-discrimination laws. Those efforts

included a written company policy forbidding racial and other unlawful types of

discrimination, communication of that policy to all decision makers and other

employees, and training on the policy.

Tyson's Equal Employment Opportunity, Fair Employment Practice,

Personnel Policy required that all "management team members" be "responsible

for complying with the provisions of the Equal Employment Opportunity Policy."

The "Personnel Actions" part of the policy stated:

> *All actions concerning company people should be in the spirit of and consistent with the principles of Equal Employment Opportunity.* Such actions include, but are not limited to the following: recruitment, training, compensation, transfers, return from layoffs, education, hiring, promotion, benefits, layoffs, company sponsored training, social and recreational programs. *All personnel decisions regarding the above are made without regard to race*, color, religion, age, national origin, disability, veterans' status, or sex (except where sex is a bona fide occupational qualification).

(formatting altered) (emphasis added). That employment opportunity policy was

included in Tyson's policy manual. Tyson also had an additional written policy

titled "Management Standards of Behavior," which unequivocally required that

"Managers/Supervisors must ensure that the work environment under their

supervision is free from all discrimination. . . ."

45

As part of its effort to prevent discrimination in the workplace, Tyson ensured that its employees, including its managers, were well aware of and were trained on its anti-discrimination policy. The "Management Standards of Behavior" policy required that "[t]he Site Personnel Managers reinforce this policy by conducting yearly training sessions with all management personnel regarding this policy." Higgins, the human resources manager at the Gadsden plant, was the site personnel manager responsible for that training. She testified that she had "been training" other managers, including plant managers, on Tyson's policies and procedures as part of their corporate training for the twenty years that she had worked in human resources for Tyson. It was undisputed that Hatley himself was well aware of Tyson's policy prohibiting racial and other forms of unlawful discrimination in promotion and other decisions. He had been trained on the anti-discrimination policy, and he knew racial discrimination was against the law as well as against the policy.

The evidence that Tyson had made "a good faith effort to comply with" the law prohibiting racial discrimination in the workplace, see Kolstad, 527 U.S. at 545, 119 S. Ct. at 2129, was overwhelming, uncontradicted, and undisputed. No reasonable jury could find to the contrary from the evidence. Yet this jury accepted the invitation of Hithon's counsel to do just that. In her argument at the

46

damages stage, counsel did not point to any evidence indicating that Tyson had failed to make a good faith effort to prevent racial discrimination. She did not suggest anything at all that the company could have done but failed to do. Instead, she urged the jury to, in effect, misapply the law by assessing punitive damages against Tyson because of Hatley's conduct notwithstanding the company's good faith efforts to prevent racial discrimination.

Counsel argued that while Tyson had "nice policies" prohibiting discrimination, "they don't follow them." She argued that punitive damages were necessary "to punish" Tyson for not following its policies, even though the only evidence that anyone had not followed those policies was the one decision Hatley made to promote Dade instead of Hithon. Counsel urged the jury to assess punitive damages against Tyson as a way of "you going back and telling Tyson their decision was wrong." The wrong decision was Hatley's decision not to promote Hithon because of his race, a decision contrary to Tyson's policies and good faith efforts to prevent unlawful discrimination. Counsel asked rhetorically: "What amount of money is going to make Tyson pay attention to the fact that they have to follow their own policies and they have to follow the law?"

Again, counsel for Hithon never suggested that there was any evidence at all before the jury that Tyson, as distinguished from Hatley, had ever failed to follow

its own anti-discrimination policy or that Tyson was even aware that Hatley had allegedly failed to do so until after this lawsuit was filed. She urged the jury to assess punitive damages anyway, using an argument with enough hot air to float a dirigible, an argument unmoored from the law. And the jury did as she urged, awarding $1,000,000 of punitive damages in addition to the $335,000 in compensatory damages. As we have discussed, one of the reasons the district court vacated the punitive damages award was that it was "undisputed that Tyson had implemented several policies to prevent discrimination in promotion and hiring decisions."

The district court did not err. The theory that Hithon's counsel pitched to the jury, and pitches to us, is that an employer's good faith efforts to prevent discrimination in employment decisions do not matter so long as someone in a position to make a hiring or promotion decision violates that policy even once. If accepted, that theory would butcher precedent and eviscerate the good faith defense.

The only time that any type of damages, including punitive damages, are ever considered is when there has been an unlawfully discriminatory job action. Before the question of whether punitive damages can be assessed comes up, there always will have been a finding that someone to whom the employer has delegated

48

the authority to make an employment decision has misused that authority to discriminate unlawfully. If, as Hithon's counsel insists, a single misuse of managerial authority resulting in discrimination establishes that the employer did not make good faith efforts to prevent that discrimination, then the good faith defense does not exist. Under her theory the only time that the good faith defense to vicarious liability for punitive damages could come into play would be when there was no violation of the job discrimination laws to begin with, and therefore no basis for compensatory or punitive damages. Counsel has not explained to us the utility of a defense that exists only when there is no need for it. Her version of the good faith defense is a defense that has no purpose, serves no function, and makes no sense.

Counsel's makeover of the good faith defense is also contrary to the Supreme Court's decision in Kolstad that even where the decision maker has discriminated with the requisite "evil motive," 527 U.S. at 538, 119 S. Ct. at 2126, that alone is not enough "for imputing liability to an employer in the punitive damages context," id. at 540, 119 S. Ct. at 2127. The Court decided, instead, that "in the punitive damages context" an employer may not be held "vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good faith efforts to comply with" anti-

49

discrimination laws. Id. at 545, 119 S. Ct. at 2129 (quotation marks omitted). Hatley was, at most, one of hundreds of managerial agents for Tyson at its plants scattered around the world. Under the Kolstad precedent, Tyson cannot be held vicariously liable for Hatley's decision to promote Dade instead of Hithon to the shift manager position at the Gadsden plant, because that "discriminatory employment decision[] of [a] managerial agent[]" was "contrary to [Tyson's] good faith efforts to comply with" anti-discrimination laws. Id., 119 S. Ct. at 2129.

Hithon's counsel urges us to reinstate the $1 million punitive damages award for a reason that is contrary to the law laid down in Kolstad. Supreme Court precedent is not like the ash on a cigarette, to be flicked off whenever convenient. The district court followed the Kolstad decision in setting aside the punitive damages award, and we follow that decision in affirming the district court's judgment.[14]

**AFFIRMED.**

---

[14] Because we are affirming the district court's judgment vacating the punitive damages award on the two grounds discussed in this part of our opinion, we have no occasion to address Tyson's alternative argument that the award was constitutionally excessive.